UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES L. STROUP                          CIVIL ACTION

VERSUS                                   NUMBER: 05-5214

MICHAEL J. ASTRUE,                       SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 21, 25, 29).

James L. Stroup, plaintiff herein, field an application for DIB on March 6, 1996, alleging disability as of May 14, 1994. (Tr. pp. 86-88).  In a Disability Report completed around the same time, plaintiff identified low back problems as the condition resulting in his inability to work.  (Tr. pp. 110-117).  Plaintiff's

application for DIB was denied at the first step of the
Commissioner's administrative review process on March 29, 1996 and
was not appealed further. (Tr. pp. 31-34).[1]/

Plaintiff filed a second application for DIB on February 28,
1997, again alleging disability as of May 14, 1994. (Tr. pp. 90-
92). That application was denied initially and upon
reconsideration. (Tr. pp. 35-38, 40-41). Pursuant to plaintiff's
request, a hearing de novo before an Administrative Law Judge
("ALL") went forward on November 16, 1998 at which plaintiff, who
was represented by counsel, appeared and testified. (Tr. pp. 42-
43, 630-647). On January 27, 1999, the ALJ issued a decision that
was partially favorable to plaintiff insofar as he was found to be
disabled under Rule 201.09 of the Medical-Vocational Guidelines
(the "Grids") as of September 29, 1998, the day before his fiftieth
birthday. (Tr. pp. 48-56).[2]/

_____

[1]/ As a result of plaintiff's failure to appeal this decision
to the next level of the administrative review process, the initial
denial became the final, binding decision of the Commissioner, 20
C.F.R. §404.905, and adjudicated plaintiff's entitlement to DIB
from the alleged onset date through the date of the initial denial.
Plaintiff's first application for DIB is not now before the Court
and the Court has no jurisdiction to review it. Califano v.
Sanders, 430 U.S. 99, 107-09, 97 S.Ct. 980, 985-86 (1977); Muse v.
Sullivan, 925 F.2d 785, 787 n.1 (5th Cir. 1991).

[2]/ In his partially favorable decision, the ALJ noted that an
offset may be appropriate given plaintiff's receipt of workers'
compensation benefits. (Tr. p. 56). The ALJ also recommended that
plaintiff's continued entitlement to DIB be reviewed early "[d]ue

Dissatisfied with that portion of the ALJ's decision which failed to award him benefits from the alleged onset date of May 14, 1994 up to September 29, 1998, plaintiff sought review of the ALJ's decision by the Appeals Council ("AC").  (Tr. pp. 57-61).  On June 15, 2001, the AC vacated the ALJ's decision and remanded the matter for further evaluation of the medical evidence regarding plaintiff's back impairment and for further consideration of his residual functional capacity ("RFC").  (Tr. pp. 62-65).  Pursuant to that remand, a second hearing was held before a different ALJ on August 28, 2002 at which plaintiff, who was again represented by counsel, a medical expert ("ME"), and a vocational expert ("VE") appeared and testified.  (Tr. pp. 570-629).  On January 3, 2003, the second ALJ issued a written decision that was once again partially favorable to plaintiff insofar as he was found to be disabled from April 15, 1998 until November 21, 2000 and was thus entitled to DIB for that closed period alone.  More specifically, for the time period from May 14, 1994 to April 14, 1998, plaintiff was found to have a RFC for light work and to be capable of performing a significant number of such jobs existing in the local and national economies.  The ALJ further found that as of November 22, 2000, plaintiff had experienced medical improvement related to

_____

to the probability of medical improvement ..."  (Id.).

3

his ability to work and was capable of performing a significant range of light work from that point forward.  Once again, plaintiff requested review of the partially favorable decision by the AC which, following its receipt of additional letters and material from plaintiff's counsel, denied the request for review on July 9, 2005.  (Tr. pp. 6-9).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff raises the following issues for judicial review:

1)   the Commissioner's decisions are not supported by substantial evidence in that plaintiff was wrongfully found to be capable of work before April 15, 1998 and after November 21, 2000;

2)   the ALJ erred in failing to find that plaintiff's back impairment met the requirements of Section 1.05(C) of the Listing of Impairments;

3)   the second ALJ erred in failing to find that plaintiff was disabled as a of September 29, 1998 under Grid Rule 201.09;

4)   the ALJ's gave improper weight to the opinions of Dr. Mel Parnell and to those of the consultative examiners; and,

5)   the second ALJ wrongfully denied plaintiff's request for a continuance of the August 28, 2002 hearing in order to obtain the testimony of one of his treating physicians and a lay witness.

(Rec. doc. 21, pp. 2-4).

Relevant to the issues to be decided by the Court are the following findings set forth in the operative hearing decision of

4

the ALJ:

1.  [t]he claimant meets the nondisability requirements for
    a period of disability and Disability Insurance Benefits
    set forth in Section 216(i) of the Social Security Act
    and continued to meet them through at least the date that
    his disability ceased.

2.  [t]he claimant has not engaged in substantial gainful
    activity since the alleged onset of disability.

3.  [t]he claimant's degenerative disk disease is a severe
    impairment, based upon the requirements in the
    Regulations (20 C.F.R. §404.1521 and Social Security
    Ruling 96-3p).

4.  [t]he claimant does not have an impairment that meets or
    medically equals one of the listed impairments in
    Appendix 1, Subpart P, Regulation No. 4.

5.  [t]he undersigned finds the claimant's allegations
    regarding his limitations are not totally credible for
    the reasons set forth in the body of the decision.

6.  [t]he undersigned has carefully considered all of the
    medical opinions in the record regarding the severity of
    the claimant's impairment (20 C.F.R. §404.1527).

7.  [f]rom May 14, 1994 through April 14, 1998, the claimant
    had the residual functional capacity to do essentially
    light work.  He could lift 20 pounds occasionally and
    frequently lift lighter weights; and sit, walk and stand
    each 90-120 minutes continuously.  He could sit and
    stand/walk each a total of 4-6 hours in an eight hour
    workday.  He could not work at heights or climb ladders,
    and could only occasionally do overhead work.  He could
    occasionally kneel and crawl.

8.  [t]he claimant from May 14, 1994 through April 14, 1998,
    was a "younger individual" (20 CFR §404.1563).

9.  [g]iven his residual functional capacity, he could not do
    his past relevant work.

10.   [a]lthough the claimant's exertional limitations did not allow him to perform the full range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making on the basis of vocational expert testimony, during the specified period, there were a significant number of jobs in the national economy that he could perform.

11.   [f]rom April 15, 1998 through November 21, 2000, the claimant's residual functional capacity was so severely compromised that he was not able to do work of any kind on regular or continuing basis.

12.   [a]s of November 22, 2000, the claimant[] experienced medical improvement which was directly related to his ability to engage in work activities.

13.   [s]ince November 22, 2000, through at least the date of this decision, the claimant has had the residual functional capacity to do essentially light work. He can lift 20 pounds occasionally and frequently lift lighter weights; and sit, walk and stand each 90-120 minutes continuously. He can sit and stand/walk each a total of 4-6 hours in an eight hour workday. He cannot work at heights or climb ladders, and can only occasionally do overhead work. He can occasionally kneel and crawl.

14.   [s]ince November 22, 2000, the claimant has been unable to perform any of his past relevant work. (20 CFR §404.1565).

15.   [t]he claimant is an "individual closely approaching advanced age" (20 CFR §404.1563).

16.   [a]lthough the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule[] 202.14 as a framework for decision-making and considering vocational expert testimony, there are a significant number of jobs in the national economy that he can perform.

17.   [t]he claimant was under a "disability," as defined in the Social Security Act, from April 15, 1998 through November 21, 2000. At all other times considered through at least the date of this decision he has not been

disabled  (20 CFR §404.1520(f)).

(Tr. pp. 25-26).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592

7

(5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4.  if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.
>
> 5.  if an individual's impairment precludes him from

performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the administrative hearing held on August 28, 2002, plaintiff was fifty-three years of age, had completed nine grades of formal education, and had past relevant work experience as a crane operator, truck driver, and diesel mechanic. Plaintiff's counsel began the hearing with an opening statement in which she summarized plaintiff's work and treatment history. Plaintiff had undergone a successful lumbar fusion in 1974

following which he was able to engage in medium to heavy work over
the span of the next twenty years.  On May 14, 1994, plaintiff
suffered a workplace accident in which he was knocked by a crane to
the deck ten to fifteen feet below, resulting in seven fractured
ribs and a back injury.  Following the accident, plaintiff was seen
by Dr. Mel Parnell, his employer's doctor, as well as Dr. Courtney
Russo, both of whom are orthopedists.  Dr. Russo treated plaintiff
conservatively over the next three years but ultimately referred
plaintiff to Dr. Thomas Whitecloud, Chairman of the Department of
Orthopedic Surgery at the Tulane University Hospital and Clinic,
due to complaints of pain radiating into the leg.  After examining
plaintiff in June of 1997 and reviewing plaintiff's treatment
records, Dr. Whitecloud recommended a second fusion which was later
performed in April of 1998 after plaintiff's workers' compensation
insurer agreed to fund the procedure.

Subsequent to the surgery, plaintiff's pain level improved but
he still had some physical restrictions. Plaintiff then experienced
problems with overuse of pain medication and when the fusion failed
to solidify, revision surgery was performed in November of 1999 to
address the loosening of the fusion hardware.  Again, plaintiff
experienced improvement as a result of the revision but continued
to have pain.  In the meantime, plaintiff had turned fifty and the
first ALJ assigned to his case had found him disabled from that

point forward under Grid Rule 201.09.  Plaintiff also began suffering from problems related to his hypertension and, more recently, had injured his knee in a fall and was to undergo arthrosporic surgery for that in three weeks.  Counsel argued that plaintiff was unable to work at anytime subsequent to his May 14, 1994 on-the-job injury and that both the light and sedentary Grid rules compelled that result.  (Tr. pp. 572-581).

Following counsel's opening remarks, plaintiff took the stand and provided additional specifics on his prior work and medical history.  Plaintiff's 1974 fusion obviously produced a very good result as he was able to perform medium to heavy level work after undergoing that procedure.  Plaintiff testified that subsequent to his workplace injury in 1994, Dr. Russo had limited him to light level work but his employer at the time, Bayou Steel Corporation, advised him that it had no positions available at that exertional level.  As such, plaintiff never attempted light-level work at Bayou Steel or anywhere else. In the period of time between the accident and his second fusion in 1998, plaintiff attended physical therapy, went to a pain clinic, and was initially taking three Vicodins per day for pain relief which left him very forgetful.  In terms of daily activities, plaintiff was able to wash dishes, do laundry, cook, and mow the lawn although he would suffer for it for the next few days.  During that time frame, plaintiff estimated

that he could sit for only five to ten minutes before experiencing spasms, that he could stand for ten to fifteen minutes at a time, and that he could walk one mile on "good days" but only the length of two houses on other days.  After undergoing the second fusion on April 15, 1998, plaintiff experienced immediate improvement as he had no more radiating pain.  By November of 1998, plaintiff was only taking Tylenol for pain relief which, he explained, was the result of his effort to wean himself from the Vicodin at any cost. Between the 1998 fusion and the 1999 revision surgery, plaintiff testified that he was able to walk one to two miles per day, cut the grass with a self-propelled mower, drive short distances, lift fifteen to twenty pound, stand and/or walk for thirty to forty-five minutes at a time, and sit for the latter time period, albeit with his legs elevated.

Subsequent to the revision surgery, plaintiff experienced almost immediate improvement and he was easily able to walk one to two miles, run errands, drive for extended periods of time, sit and/or stand for two hours at a time, and lift fifteen to twenty pounds.  However, plaintiff testified that the improvement lasted only two to three months.  When he returned to Dr. Whitecloud in October of 2001, plaintiff advised that his condition had worsened three months earlier and it remained so from that point forward. Although he had been prescribed Vicodin, plaintiff only took over-

the-counter medication for pain relief.  More recently, plaintiff had injured his knee in a fall and standing and walking were limited to five minutes.  Vioxx did provide some relief, unlike the cortisone injection he was given, and arthoscopic surgery was being considered.  (Tr. pp. 581-596).

Upon being tendered to his attorney for questioning, plaintiff testified that before his fusion in 1998, he could walk one mile but that he no longer even attempted to do so, opting instead to just engage in his "normal daily activities".  In spite of his ability to walk that distance, plaintiff testified that he had to lie down for pain relief on an almost daily basis for anywhere between twenty minutes to two to three hours.  Prescribed pain medication had a side effect of hearing loss and plaintiff had recently been advised to obtain a hearing aid.  Before the 1998 surgery, plaintiff could lift a gallon of milk, but not repetitively, had difficulty sleeping, and experienced pain in the back, hip, and right leg.  Post-surgery, the radiating pain subsided and plaintiff experienced just a dull throb which still remained as of the time of the hearing.  Following the revision surgery, plaintiff was able to walk one to two miles throughout the neighborhood with occasional breaks and his lifting capacity remained the same.  For pain relief, plaintiff would lie down, take Tylenol, and soak in the hot tub.  It was the unpredictable nature

of his pain that rendered him unable to work on a regular,
continuous basis. As of the day of the hearing, plaintiff's
medications included Celexa, Vicodin, Tiazac, and Vioxx. (Tr. pp.
596-603).

Dr. George Weilepp, a ME in the field of orthopedic surgery,
was next to testify. He had previously been furnished the bulk of
plaintiff's medical records and was brought up to date with
treatment records generated earlier in the year which focused more
on plaintiff's knee problem than his back. From a non-orthopedic
standpoint, Dr. Weilepp identified plaintiff's problems as obesity
and hypertension, poorly controlled but with no evidence of end
organ damage. From an orthopedic standpoint, plaintiff was
described as an individual with a remote, prior two-level fusion in
1974 which remained solid following his 1994 on-the-job injury
which was primarily soft-tissue in nature. Plaintiff was cleared
for light level work in February of 1996 and a functional capacity
evaluation which was conducted following a bone scan showed no
significant changes in the lumbar spine, only rib and shoulder
involvement. Dr. Weilepp testified that the level immediately above
the site where a fusion is performed typically becomes "more
reactive" in later years. The ME further testified that
plaintiff's first fusion was "non-surgical" following his workplace
accident until the time that he saw Dr. Whitecloud who recommended

14

a second fusion based on a number of factors. There were no complications from that surgery and plaintiff was released from the clinic in November of 2000. At a follow-up visit in October of 2001, plaintiff's fusion was declared solid and he was formally discharged by his orthopedist.

In summary, from May of 1994 until the "elective" surgery performed by Dr. Whitecloud in April of 1998, Dr. Weilepp opined that plaintiff was capable of performing light level work and that his condition did not satisfy the criteria of Listing 1.03 for twelve consecutive months. From the time of the second fusion in 1998 until November of 2000, plaintiff had a less-than sedentary period consistent with the fusion, a recovery period, the revision surgery, and a recovery period following that. Beginning in November of 2000, however, the ME opined that plaintiff was once again capable of a restricted range of light work although Dr. Weilepp did defer to the ALJ as to whether plaintiff's improvement was achieved by November of 2000 as opposed to October of 2001 when he was discharged by his orthopedist. The doctor did express some difficulty in offering an opinion with respect to plaintiff's knee problem but the range of motion appeared to be satisfactory and light duty would continue to be the ME's recommendation. (Tr. pp. 603-615).

Dr. Weilepp was then tendered to plaintiff's counsel for

cross-examination.  When directed to plaintiff's blood pressure readings in May of 2002, Dr. Weilepp testified that plaintiff's ability to do light level work would not be effected except for avoidance of temperature extremes and jobs with a great deal of stress.  The ME further questioned Dr. Whitecloud's decision to perform the 1998 fusion at all given plaintiff's lifestyle and the fact that he had not even attempted to perform light-level work following his accident in 1994.  (Tr. pp. 615-618).

John Yent, a VE, was the final witness to take the stand.  He began by classifying the exertional demands and skill levels of plaintiff's past work which were either medium or heavy and semi-skilled, respectively.  The ALJ then presented Yent with a hypothetical question which assumed that plaintiff could lift twenty pounds occasionally, lighter weights frequently; could sit and/or stand four to six hours per eight-hour workday, one to two hours without interruption; could walk one to two miles; could occasionally bend, kneel, and crawl; and, would have to avoid heights, temperature extremes, and doing overhead work for extended periods of time.  With those limitations in mind, the VE testified that plaintiff would be unable to perform any of his past relevant work.  He would, however, be able to perform 25% of light, unskilled occupations and 10% of sedentary, unskilled occupations.  Such light, unskilled jobs included cashier, assembler, and general

laborer, all reduced by 50%.  Sedentary, unskilled jobs included cashier, bookkeeping clerk, and assembler.  Upon further questioning by plaintiff's attorney, Yent testified that plaintiff would be unable to perform the identified jobs if he had to lie down periodically for pain relief.  In addition, if plaintiff was unable to stand for more than five minutes at a time due to knee pain, he would only be able to perform 25% of the identified sedentary jobs. (Tr. pp. 618-627).  In closing, counsel reiterated the arguments she had urged in her opening statement.  As of the date of the administrative hearing, plaintiff was no longer receiving workers' compensation benefits, having possibly settled his claim for $200,000, with counsel to provide the ALJ with a copy of any settlement agreement. (Tr. pp. 627-629).

Before proceeding to the specific challenges enumerated by plaintiff, the Court pauses to clarify the relevant time period at issue in this litigation.  The subject application for DIB was filed on February 28, 1997 with an alleged onset date of May 14, 1994.  As noted earlier, plaintiff had filed a prior application for DIB containing the same onset date which was denied at the initial level of the Commissioner's administrative review process on March 29, 1996 and was not appealed further.  As a result of plaintiff's failure to seek reconsideration of that decision at the next level of the administrative review process, the initial denial

17

became the final, binding decision of the Commissioner, 20 C.F.R. §404.905, and plaintiff's claim for benefits for the period of time prior to March 29, 1996 is subject to the doctrine of administrative res judicata as between the parties and cannot be reviewed here.  Muse, 925 F.2d at 787 n.1.

In his first challenge to the Commissioner's decision, plaintiff alleges that the ALJ's opinion is not supported by substantial evidence insofar as plaintiff was found to be capable of working from May 14, 1994 to April 14, 1998 and subsequent to November 22, 2000.

As established by the testimony adduced at the administrative hearing, plaintiff underwent a lumbar fusion in 1974 and was thereafter able to perform work up to a heavy exertional level over the following twenty years.  Plaintiff sustained a workplace injury on May 14, 1994 and was treated conservatively by Dr. Russo over the next several years.  During that time, plaintiff was also followed by Dr. Mel Parnell at the request of plaintiff's employer, the last evaluation being February 1, 1996 which was just prior to the relevant time period at issue herein.  Plaintiff reported experiencing "good" days and "bad" days with standing causing pain radiating from his back into his right leg and his legs occasionally giving out.  Dr. Russo had prescribed Vicodin and Soma which plaintiff took on a symptomatic basis as needed.  On physical

examination, plaintiff was deliberate in his gait but he was able to heel-to-toe walk, albeit with increased low back pain.  Lumbar motion was 60% of normal and there was mild paraspinous spasm bilaterally, both of which were unchanged from plaintiff's previous visit on September 15, 1994.  Straight leg raising was negative, deep tendon reflexes were intact, muscle strength was 5/5 in both lower extremities, and no calf atrophy was present.  A previous myelogram and post-myelogram CT scan had revealed grade I spondylolisthesis at L5-S1, plaintiff's earlier fusion at L4 which was solid, and no evidence of recurrent disc herniation.  Occult fracture had been ruled out in a previous bone scan and a functional capacity evaluation demonstrated that plaintiff was capable of light level work.  Dr. Parnell recommended that plaintiff embark on a program of hamstring stretching exercises and consider having Dr. Russo change his pain medication from Vicodin to Ultram, a non-narcotic.  (Tr. pp. 235-237).

Plaintiff was seen by Dr. Russo on March 6, 1996 and his condition was about the same.  He experienced pain when lifting in excess of twenty pounds and with prolonged sitting, standing, stooping, and climbing.  Robaxin and Relafin were prescribed as was heat, exercise, and the use of a corset.  (Tr. p. 287).

On March 26, 1996, an Administration medical consultant reviewed the medical records then extant and completed a "Residual

Physical Functional Capacity Assessment" form.  There, the medical consultant indicated that plaintiff could occasionally lift twenty pounds and could frequently lift ten pounds; could sit, stand, and/or walk for six hours per eight hour workday; had an unlimited push and/or pull capability; could occasionally stoop but frequently perform the other enumerated postural maneuvers; and, had no manipulative, visual, communicative, or environmental limitations.  (Tr. pp. 118-125).

Plaintiff returned to Dr. Russo on April 17, 1996 and reported that he could hardly get out of a chair.  He had not obtained the needed accessories for his prescribed TENS unit.  Flexion was limited to 50-60%, extension was limited to 20%, bending was limited to 10%, and straight leg raising was positive, more so on the right.  Dr. Russo indicated that plaintiff was on a "N/W" (no work) status and he advised plaintiff to get the accessories for his TENS unit and prescribed Relafin and Vicodin.  Physical therapy was also contemplated and plaintiff was to return in six to eight weeks.  (Tr. p. 286).  When plaintiff was next seen by Dr. Russo on May 29, 1996, he still had not obtained the TENS supplies nor had he attended any physical therapy.  Plaintiff's condition was essentially unchanged and he still had restricted flexion with pain and spasm, a reduced range of motion, and positive straight leg raising.  He was prescribed Relafin, Vicodin, and Soma and was

instructed to use a brace, heat, and exercise.  (<u>Id</u>.).

On July 29, 1996, plaintiff returned to Dr. Russo and his condition was unchanged but he was limping.  The treatment plan remained the same but Redux was added.  Dr. Russo indicated that plaintiff was in a "N/D" (no duty) status.  (Tr. p. 285).  By September 30, 1996, plaintiff was "[d]oing about the same but had increased pain and spasm with increased exercise."  Once again, the same treatment regimen was renewed and plaintiff was to return to the doctor in two months.  (<u>Id</u>.).  Plaintiff did so and his condition was unchanged on November 2, 1996.  Plaintiff's duty status and treatment plan also remained the same.  (Tr. p. 281).  By January 13, 1997, plaintiff was declared to be "no better-no worse".  He was still experiencing spasms in the lower back as well as the thighs and legs, especially during the night.  Physical findings and the treatment plan again remained the same.  (<u>Id</u>.).

Plaintiff was next seen by Dr. Russo on February 12, 1997 who remarked that he was worse that day with no improvement.  Physical findings were slightly worse than the previous visit.  This time, Dr. Russo recommended that plaintiff submit to an MRI and attend physical therapy.  Heat, rest, Tylenol #3, Soma, and Advil were also prescribed and plaintiff was to return in three to four weeks. (Tr. p. 282).  Plaintiff was still hurting badly on March 7, 1997 and reportedly could hardly walk and was "all bent over."  Range of

motion of the spine was twenty degrees and straight leg raising was positive on the right.  The MRI was to be pursued more vigorously and plaintiff's prescriptions for Ultram, Vicodin, Soma, and Elavil were written with plaintiff to return in six weeks.  (Tr. p. 281). The recommended MRI was performed on March 12, 1997 at Memorial Medical Center.   The  radiologist's  impressions  were:  1) accentuation of the lumbar lordosis; 2) grade I spondylolisthesis at L5-S1 with evidence of degenerative disc disease but no evidence of neural foraminal or central vertebral canal stenosis; 3) diffuse bulge at L2-3 with findings of degenerative disc disease but no evidence of nerve root impingement or stenosis; 4) degenerative disc disease with a diffuse bulge at L3-4 but no evidence of nerve root impingement; and 4) bilateral degenerative facet joint disease at L2-3, L3-4, L4-5, and L5-S1.   (Tr. pp. 279-280).   Plaintiff failed to keep an appointment with Dr. Russo that was scheduled for April 15, 1997.   (Tr. p. 278).   On April 18, 1997, Dr. Russo directed that a copy of a report, presumably the MRI report of March 12, 1997, be sent to plaintiff's employer. (Id.).

On May 2, 1997, plaintiff was consultatively evaluated by Dr. Mary Mathai.  Plaintiff described his back pain as moderate in nature with pain in the right hip and numbness in the thigh on the right. Plaintiff had good days and bad days, weather changes bothered him, and he reportedly used a "lift chair" to sit down.

Plaintiff had also reportedly lost bladder control a few times in January of 1997 but no mention was made of that in any of Dr. Russo's notes.  Plaintiff had a cane as well as a back brace which he used "sometimes".  His back pain was increased by "... sitting, standing, bending, lifting, etc." Medications at the time included Vicodin, Tylenol #1, Carisoprodol (sometimes not taken), Relafin, Ultram, and Amitriptyline.

In terms of daily activities, plaintiff was independent in self-care needs and was able to "... wash clothes, mop, etc." but he was unable to walk any great distance and could sit/stand for only ten to fifteen minutes.  Plaintiff reportedly needed assistance getting out of the bathtub and tying his shoes.  On physical examination, plaintiff was measured to be 5'7" tall and weighed 252 pounds.  Blood pressure was 180/120.  Plaintiff's posture was normal as was the range of motion of the cervical spine.  He also had a full range of motion in the lower extremities with complaints of back pain upon hip motion.  Plaintiff had well-developed muscles all over and sitting straight leg raising was full with support of the arms but with complaints of back pain.  As for the lumbrosacral spine, straight leg raising was positive at 45 degrees on the right and 35 degrees on the left with complaints of back pain.  Range of motion in flexion was 30 degrees and lateral extension was 15 degrees bilaterally but extension was normal.

23

There was some slight evidence of atrophy in the left lower extremity. Plaintiff had a minimally antalgic gait on the right but a neurological exam was essentially within normal limits. X-rays revealed plaintiff's previous fusion, grade I anterolisthesis at L5-S1, and asymmetric D12 ribs. Based on the results of her examination, Dr. Mathai's diagnosis was: 1) lower back pain with grade I anterolisthesis at L5-S1, a prior lumbar fusion, and no radiculopathy; 2) facet joint degenerative disease at L2-3, L3-4, L4-5, and L5-S1 per the March 12, 1997 MRI and disc bulge at L2-3 and L3-4; 3) severe hypertension; and 4) obesity. In Dr. Mathai's opinion, plaintiff had "... some back problems with pain ... [and was] not a candidate for heavy lifting, pulling, pushing, etc." (Tr. pp. 258-263).

On June 5, 1997, plaintiff underwent a second consultative evaluation, this one at the hands of Dr. John Nitsche. Plaintiff related his work and medical history to the doctor and complained of continuous muscular soreness localized in the lower lumbrosacral spine with radiation down the right leg to the ankle. His hearing was adequate with no tinnitus or vertigo. Plaintiff could reportedly walk 100 yards before becoming short of breath or experiencing back pain. He could drive and helped with household chores as he was able. Plaintiff estimated that he could lift ten to twenty pounds. Standing was possible for five to sixty minutes

24

depending on back pain and standing was limited to fifteen to thirty minutes for the same reason. On physical examination, plaintiff's blood pressure was measured to be 180/98. A neurological exam was normal and there were no signs of atrophy. Plaintiff wore a brace and a TENS unit to the evaluation. Flexion of the lumbar spine was limited 20 degrees and extension was limited 10 degrees but other movements of the spine were normal. Plaintiff did complain of some tenderness to palpation in the lower lumbar region but there was no localized muscle spasm. He also had bilateral hamstring tightness, the right more than the left, but straight leg raising was negative on both sides.

As part of the evaluation, Dr. Nitiche performed a limited functional assessment of plaintiff who was observed to be able to lift twenty pounds and to carry ten pounds. Sitting and standing were performed without difficulty but stooping elicited back pain. Plaintiff had a slight limp favoring the right leg which became less apparent the more he walked. He could heel-to-toe walk, balance, dress, and climb on and off the examination table independently. An assistive device was not necessary for plaintiff to stand or walk. In summary, Dr. Nitsche diagnosed plaintiff's problems in the following order: 1) moderate obesity; 2) shortness of breath most likely secondary to generalized deconditioning from a lack of physical activity; 3) hypertension, same to be followed

by plaintiff's primary physicians; and, 4) chronic low back syndrome, with recent radiologic studies revealing evidence of degenerative changes in the lumbar area.  In closing, Dr. Nitsche opined that plaintiff may have a difficult time performing heavy or strenuous work.  (Tr. pp. 263-268).

On June 20, 1997, Dr. Russo completed a form letter to plaintiff's employer in which he advised that he had evaluated plaintiff that day and that plaintiff was unable to return to work. Dr. Russo noted in plaintiff's chart his advices to Bayou Steel and that plaintiff was in a "no duty" status.  In addition, plaintiff "was asked to see Dr. Whitecloud."  Dr. Russo continued plaintiff's medications and advised him to return in two months.  (Tr. pp. 277-278).

On June 25, 1997, a second Administration medical consultant reviewed plaintiff's file and executed another RPFCA form.  With a primary diagnosis of degenerative disc disease and a secondary diagnosis of high blood pressure and obesity, the medical consultant found that plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; could sit, stand, and/or walk for six hours per eight hour workday; had a limited push/pull ability in the lower extremities due to findings suggestive of spondylolisthesis; could only occasionally perform the enumerated postural maneuvers; had no manipulative, visual, or communicative

26

limitations; and, was to avoid even moderate exposure to workplace hazards.  (Tr. pp. 181-188).

Plaintiff was seen by Dr. Whitecloud for the first time on June 30, 1997.  Plaintiff advised the doctor of his workplace accident and his three-year history of aching low back pain and intermittent pain radiating into the right leg.  Dr. Whitecloud reviewed the report of plaintiff's March 1997 MRI which revealed degeneration at L2, 3 and 4 and spondylolisthesis at L4, L5, and S1.  Plaintiff's 1974 fusion was described as "quite successful and he had no disc at all until he had this fall."  Dr. Whitecloud also noted that plaintiff had gained a great deal of weight recently and was at least 250 pounds at 5'8" in height.  On physical examination, plaintiff had marked restriction of motion of the lumbar spine with increasing pain on extension.  Dr. Whitecoud remarked that plaintiff was "... quite muscular and ... that he works out a lot trying to maintain muscle strength" with "... absolutely no weakness in the muscles of his lower extremities." Straight leg raising on the right elicited radiating pain down to the calf.  X-rays revealed plaintiff's earlier fusion and mild spondylolisthesis at L5-S1.  Dr. Whitecloud recommended that plaintiff undergo discography at the L2-3 and L3-4 levels, the potential sources of his chronic back pain.  However, there was no evidence of any neural compression and no extensive scarring was

27

demonstrated on MRI.  Plaintiff was instructed to begin a weight loss program and to return after the discogram was performed by Dr. Charles Aprill. (Tr. pp. 269-272).

Approximately two and one-half months after he was first seen by Dr. Whitecloud, Dr. Russo completed a second form letter to plaintiff's employer, accompanied by a copy of Dr. Whitecloud's report, in which he advised that plaintiff's condition was unchanged and that he was still able to return to work.  (Tr. p. 276).  Plaintiff's chart was noted accordingly.  (Tr. p. 275).  On September 22, 1997, Dr. Russo corresponded with Dr. Louis Balart, the Administration medical consultant who had issued the RPFCA on June 25, 1997, and advised him of the results of Dr. Whitecloud's evaluation of June 30, 1997.  (Tr. pp. 273-274).

On October 31, 1997, yet a third Administration medical consultant reviewed plaintiff's medical records and completed another RPFCA form.  There, this third consultant found that plaintiff could occasionally lift fifty pounds and could frequently lift twenty-five pounds; could sit, stand, and/or walk for six hours for eight hour workday; had an unlimited push/pull capability; could only occasionally climb and stoop but could frequently balance, kneel, crouch, and crawl; and, had no manipulative, visual, communicative, or environmental limitations. (Tr. pp. 193-200).

28

On March 4, 1998, Dr. Aprill, a radiologist, performed lumbar discography on plaintiff at the L2-3 and L3-4 levels, followed by a CT scan.  At the former level, the nucleus was well organized and although the posterior annulus was incompetent, injection did not provoke a pain response.  At the L3-4 level, fissures were noted and injection provoked definite pain.  There was no significant analgesic response following instillation of a small volume of anesthetic into the L3-4 disc.  Based on the results of the testing, the L2-3 disc was felt to be asymptomatic but the L3-4 disc was thought to be a contributing factor to plaintiff's chronic back pain.  (Tr. pp. 300-304). On March 13, 1998, Dr. Whitecloud reviewed Dr. Aprill's report and recommended a fusion at L3-4 with attendant hardware.  The doctor opined that plaintiff's workplace injury had aggravated pre-existing degeneration above the level of the 1974 fusion.  (Tr. pp. 402-403).

Plaintiff returned to the Tulane University Medical Center on April 7, 1997 for pre-operative screening. (Tr. pp. 312-13, 328-29).  Eight days later, plaintiff was admitted to the Tulane University Hospital where the fusion was performed at L3-4 by Dr. Whitecloud.  Plaintiff was discharged three days later with restrictions against bending, lifting, and twisting, a lumbrosacral corset, and Lortab for pain relief.  (Tr. pp. 308-311, 314-327, 330-394).  As noted earlier, the ALJ found that plaintiff was

29

disabled and was entitled to a closed period of benefits from the date of this surgery until November 21, 2000.

Plaintiff was seen again by Dr. Whitecloud on the latter date and was two years post anterior posterior L3 to L5 fusion at that point in time.  In the brief chart note plaintiff was described to be doing "very well" and was discharged from the doctor's care. (Tr. pp. 435-436).  Plaintiff returned to Dr. Whitecloud eleven months later on October 10, 2001 and reported that his back had been asymptomatic until three months earlier when he again began experiencing progressively worsening back pain but with no radiation or radicular symptoms.  On physical examination, there was tenderness to palpation in the upper lumbar region and mild back pain on straight leg raising bilaterally but motor strength was 5/5 throughout and reflexes and sensation were intact.  X-rays taken at the time were questionable for grade I retrolithesis at L2-3 and further imaging studies were requested.  (Tr. pp. 429-431).  A CT scan subsequently performed on November 1, 2001 revealed evidence of the fusion at L3-4, grade I retrolisthesis at L2-3, and grade I spondylolisthesis at L5-S1.  (Tr. pp. 432-434).

On December 11, 2001, plaintiff was seen by Dr. Steven Holmes, a family practitioner, for complaints of a headache, sore throat, coughing, and ear involvement.  The assessment was: 1) bronchitis, 2) hypertension, and 3) chronic low back pain due to degenerative

disc disease.  (Tr. p. 552).  Plaintiff returned to Dr. Stevens on January 18, 2002 for treatment of a laceration after a caulk gun fell off of the top of a ladder he was using and hit him on the top of the head.  The wound was sutured and plaintiff was prescribed Norvasc.  (Tr. p. 551).  Plaintiff was seen again by Dr. Stevens one week later for removal of the sutures and to monitor his blood pressure which was measured at 186/120.  Plaintiff's hypertension was characterized as uncontrolled but it was noted that he had only taken his Norvasc at 8:00 a.m. that day.  The dosage of Norvasc was increased.  (Tr. p. 550).

Plaintiff was seen by Dr. Terry Habig on February 26, 2002 after having fallen on his right knee two months earlier.  The pain was exacerbated by standing, walking, and climbing stairs but there was only minimal swelling and plaintiff was not taking anything for pain relief.  On physical examination, there was some slight thickening/effusion.  Extension was full and flexion was limited by only 5 degrees with pain.  There was moderate patellofemoral crepitus with range of motion, tenderness to palpation of the patellofemoral joint, and mild tenderness medially and laterally but no instability.  The impression was: 1) right knee pain, 2) possible slight effusion/synovitis, right knee, 3) chondromalacia of the right knee, 4) right knee stiffness, and 5) possible torn lateral meniscus in the right knee.  Dr. Habig administered a

cortisone injection to plaintiff's knee, placed him on a home exercise program, and advised him to return in three weeks. (Tr. pp. 541-544).

Plaintiff returned to the Tulane University Clinic on March 25, 2002 for the results of a recent CT myelogram of his low back by Dr. James Ricciardi. The doctor remarked that "... there really doesn't seem to be anything that's very abnormal other than the fact that he's had previous surgery." The L3-4 segment was solidly fused and the retrolisthesis at L2-3 was present back in 1996 and was not a new finding. Plaintiff's primary complaint at the time was right knee pain which he thought was related to his back problem. On examination, flexion was limited in the right knee but extension was full and the ligaments were stable. The medial joint line was markedly tender. Dr. Ricciardi opined that plaintiff had a torn meniscus. The plan was to obtain an MRI and to refer plaintiff to a sports medicine specialist for further evaluation. In closing, the doctor noted that "... I did not find anything seriously wrong with his back." (Tr. p. 547). The recommended MRI was done on March 27, 2002. The results of that test were: 1) arthritic changes of the chondromalacia, 2) no evidence of meniscus tear, 3) large soft tissue contusion and grade I-II sprain of the MCL, and 4) grade III chondromalacia patella of the medial facet of the patella. (Tr. pp. 545-546).

On April 30, 2002, plaintiff was seen again by Dr. Stevens to have blood work done and to have his blood pressure checked which was measured at 170/120.  Plaintiff was out of his prescribed medication at the time.  The assessment was hypertension and torn cartilage in the right knee.  Medication was prescribed and plaintiff was referred for blood work.  (Tr. p. 549).  On May 8, 2002, plaintiff's blood pressure was 170/106 and Dr. Stevens questioned whether the hypertension was secondary to plaintiff having previously taken Redux.  (Tr. p. 548).  Plaintiff underwent a hearing test on August 2, 2002 which revealed a hearing loss above 2000 hertz, probably due to industrial noise.  Plaintiff was given a quote for an in-canal digital hearing aid.  (Tr. pp. 555-557).

Finally, by letter dated May 2, 2005, Dr. Russo corresponded with plaintiff's attorney and offered a summary of the treatment plaintiff had received.[3] In that letter, Dr. Russo disavowed that Dr. Parnell had been plaintiff's "treating physician" at any point in time.  Dr. Russo also stated that in his experience, workers' compensation doctors typically see a patient once or twice, render a report, and make no treatment recommendations.  According to Dr.

---

[3] The government has conceded that Dr. Russo's letter and its attachment were duly submitted to the AC and can thus be considered by the Court.  (Rec. doc. 25-2, p. 11). Higginbotham v. Barnhart, 405 F.3d 332, 337-38 (5th Cir. 2005).

Russo's missive, there had been a four month period in 1995 when he had encouraged plaintiff to try light duty work.  "Subsequently, he was not able to perform this type of work and eve[r] since 1995 or the beginning of 1996, we resumed the 'no work duty status' until the present time."  Dr. Russo's contemporaneous treatment notes from 1995 and 1996 make no mention about plaintiff being encouraged to do light level work and plaintiff himself testified at the administrative hearing that he made no attempt to perform any such work.  Dr. Russo also indicated that he had seen plaintiff in 2005 but no treatment note from that visit appears in the record.  Reference was also made, for the first time, of plaintiff "still" having a 25% permanent whole physical impairment rating.

Accompanying Dr. Russo's letter of May 2, 2005 was a form he completed denominated as a "Medical Assessment of Ability to do Work-Related Activities (Physical)" which, the doctor indicated, contained restrictions in plaintiff's "... various activities at work."  In that form, Dr. Russo wrote that plaintiff could lift only five pounds; could sit, stand, and/or walk one to two hours per eight-hour workday, only thirty minutes without interruption; could only occasionally balance but could never climb, stoop, kneel, crouch, or crawl; had deficits in reaching and pushing/pulling; and, had restrictions against working with moving machinery and in cold temperatures and high humidity.  (Rec. doc.

34

21, ex. A-6, pp. 5-9).

Plaintiff's first challenge to the Commissioner's decision is that said decision is not supported by substantial evidence as repsects those portions of the decision that were unfavorable to him. On that score, the Court notes that the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 129 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990). In addition, the law is clear that the burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's testimony and subjective complaints against the objective medical evidence that has been produced. Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing Jones, 702 F.2d at 621 n. 4). The evaluation of a plaintiff's subjective symptoms is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court. Harrell, 862 F.2d at 480. The ALJ may discredit a

plaintiff's subjective complaints of pain and other limitations if he carefully weighs the objective medical evidence and articulates his reasons for doing so. <u>Anderson v. Sullivan</u>, 887 F.2d 630, 633 (5th Cir. 1989)(citing <u>Abshire v. Bowen</u>, 848 F.2d 638, 642 (5th Cir. 1988)).

A review of the ALJ's decision readily reveals that he considered multiple pieces of evidence - the medical records admitted in the administrative proceedings below, the testimony adduced at the administrative hearing, and the other documentary evidence, including the RPFCA forms completed by the medical consultants - in arriving at the ultimate decision as to whether plaintiff was disabled within the meaning of the Social Security Act.  In doing so, the ALJ discussed under separate headings the reports and opinions of the doctors who had evaluated plaintiff on a sustained basis, including Dr. Parnell, Dr. Russo, Dr. Whitecloud, Dr. Aprill, Dr. Ricciardi, and Dr. Habig; the testimony of the ME, Dr. Weilepp; and, the reports of the consultative examiners and medical consultants.  (Tr. pp. 17-18, 24, 24-25). The ALJ also broke down the evidence to correspond to the closed period for which benefits were awarded and the time spans preceding and following that closed period.  (Tr. pp. 19-21, 22, 22-25).  On February 1, 1996, which was just prior to the time period at issue in this litigation, Dr. Parnell concluded that plaintiff was

capable of light level work based on the results of his evaluation, other testing, and a recent functional capacity evaluation. Plaintiff would subsequently testify at the administrative hearing that before his fusion in 1998, he could perform activities such as washing the dishes, doing laundry, mowing the lawn, walking one mile at a time, and lifting objects the weight of a gallon of milk. He also testified that Dr. Russo had limited him to light-level work subsequent to the 1994 accident but that no such work was available at Bayou Steel and that he did not seek it out elsewhere. Contrary to that testimony, Dr. Russo's May 2, 2005 letter to plaintiff's counsel suggested that plaintiff had, in fact, attempted work at the light level but " ... was not able to perform this type of work ..." and was accordingly placed on a "no work duty status."  On March 6, 1996, Dr. Russo himself noted that plaintiff experienced pain only when lifting in excess of twenty pounds and with prolonged sitting, standing, stooping, and climbing, findings which are not preclusive of light work activity. 20 C.F.R. §404.1567(b).  Shortly thereafter, the first of what would ultimately be three Administration medical consultants reviewed plaintiff's file and similarly concluded that he was capable of light-level work.

Over the next year, plaintiff saw Dr. Russo every month or two during which he was treated conservatively and his condition

remained essentially unchanged.  Plaintiff would then undergo two separate consultative evaluations at the hands of Drs. Mathai and Nitsche whose reports are much more comprehensive and detailed than the brief chart notes of Dr. Russo.  Dr. Mathai noted that plaintiff was muscularly well-developed and that he was able to perform various household chores.  Plaintiff appeared for this evaluation using a cane even though no mention of assistive devices was made in any of the prior medical records.  Ultimately, Dr. Mathai only limited plaintiff from heavy lifting, pushing, and pulling.  When he was examined by Dr. Nitsche, plaintiff advised that he could drive, do household chores, and lift ten to twenty pounds.  There were no neurological deficits or atrophy and straight leg raising was negative.  Dr. Nitsche even performed his own limited functional capacity assessment of plaintiff which produced results consistent with the performance of light work.  Accordingly, Dr. Nitsche indicated that plaintiff was not a candidate for heavy or strenuous work.

On June 20, 1997, Dr. Russo completed a form letter to plaintiff's employer in which he indicated that he had evaluated plaintiff that day who was in a "no duty" status.  No contemporaneous treatment notes from that reported evaluation appear in the record.  Several days later, a second medical consultant opined that plaintiff could perform light-level work.

38

Plaintiff was then seen for the first time by Dr. Whitecloud. Although he had a restricted range of motion in the lumbar spine, plaintiff advised the doctor that he worked out a great deal and he was quite muscular with no weakness. A second letter to Bayou Steel from Dr. Russo indicates that plaintiff was evaluated on September 15, 1997 but again no treatment notes from that visit can be found. The following month, yet a third Administration medical consultant concluded that plaintiff could work, this time at the medium exertional level. Dr. Aprill would subsequently do a discogram on March 4, 1998 and Dr. Whitecloud performed the fusion on April 15, 1998.

Faced with the various reports of Drs. Russo, Whitecloud, Parnell, Mathai, Nitsche, and those of the non-examining medical consultants, the ALJ utilized the services of a ME to interpret and harmonize the opinions of the doctors. After reviewing the voluminous medical records, Dr. Weilepp believed that plaintiff had sustained primarily soft-tissue injuries in his 1994 accident and that the 1998 fusion was, for all intents and purposes, elective in nature. Using that expert testimony as a guidepost and in light of the competing evidence before him, the ALJ concluded that plaintiff was capable of light-level work. Given the deference embodied by the substantial evidence standard, the Court is unable to say that the ALJ erred in reaching the conclusion that he did.

As respects the time period subsequent to November 20, 2000, the Court likewise concludes that substantial evidence supports the Commissioner's decision that plaintiff was not disabled. Following his revision surgery in November of 1999, plaintiff testified that he experienced immediate improvement and was able to lift fifteen to twenty pounds, walk one to two miles, run errands, drive an automobile for extended periods of time, and sit and/or stand for two hours at a time. Plaintiff was seen by Dr. Whitecloud on March 28, 2000 and indicated that he was doing OK and was taking very little pain medication. (Tr. p. 441). X-rays taken on December 13, 1999 and April 11, 2000 showed no evidence of hardware failure. On November 21, 2000 plaintiff was seen again by Dr. Whitecloud. The doctor's brief note on that date indicates that plaintiff was " ... doing very well and is discharged from our care." No physical restrictions were noted. Plaintiff testified at the administrative hearing that the improvement he experienced following the revision surgery lasted only a few months. This is at odds with the treatment notes generated subsequent to November of 1999 and plaintiff's report to Dr. Whitecloud on October 10, 2001 that his back pain, without radiation or radicular symptoms, had worsened just three months earlier. While plaintiff had some tenderness and mild back pain on straight leg raising, strength was 5/5 throughout and reflexes and sensation were intact. A CT scan

40

done on November 1, 2001 revealed grade I retrolisthesis at L2-3 and grade I spondylolisthesis at L5-S1.

Although not specifically mentioned by the ALJ, on January 18, 2002, plaintiff was seen by Dr. Holmes for treatment of a laceration after a caulk gun fell off the top of a ladder he was using and struck him on the head. Plaintiff's ability to engage in such activities casts doubt on his asserted claim of disability. Plaintiff saw Dr. Habig for a knee injury that had occurred two months earlier but no mention of such an injury appears in Dr. Steven's previous treatment notes. The knee was stable and plaintiff was taking no medication for pain relief. A March 2002 CT myelogram revealed no abnormalities to plaintiff's back and an MRI of the knee confirmed that plaintiff had no meniscus tear, just arthritis and chondromalacia. On several dates throughout this time period, plaintiff's blood pressure readings were high but his medication compliance was less than consistent. At a minimum, there was no evidence of end organ damage and the ME testified that plaintiff's hypertension would not preclude him from engaging in light work activity.

Dr. Russo's letter of May 2, 2005 and its attachment do not alter the Court's conclusion that the Commissioner's decision is supported by substantial evidence. To the extent that the treatment summarized in that letter if supported by the medical

records admitted in the administrative proceedings below, it is
cumulative.   To the extent that it is not so supported, the
doctor's statements are entitled to little weight.   There is no
evidence, for example, that plaintiff attempted light level work at
any time subsequent to May 15, 1994 and was simply unable to do it.
Dr. Russo's statement that plaintiff had a 25% permanent impairment
to the body as a whole does not equate with an inability to engage
in a limited range of light-work activity.   Given Dr. Russo's
obvious knowledge of and communications to plaintiff's employer and
its compensation carrier, any declarations regarding plaintiff's
status appear to be directed to his ability to perform heavy level
work as he had done there.   Finally, the RFC form accompanying Dr.
Russo's letter is likewise entitled to diminished weight as it is
unaccompanied by any contemporaneously-recorded, medically
acceptable findings.   See Warncke v. Harris, 619 F.2d 412, 417 (5th
Cir. 1980).   This claim is without merit.

In his second challenge to the Commissioner's decision,
plaintiff alleges that the ALJ failed to find him disabled under
Section 1.04 of the Listing of Impairments.   That Section provides
that an individual will be deemed disabled if he suffers from:

> [d]isorders of the spine (e.g., herniated nucleus
> pulposus, spinal arachnoiditis, spinal stenosis
> osteoarthritis, degenerative disc disease, facet
> arthritis, vertebral fracture), resulting in compromise
> of a nerve root (including the cauda equina) or the

spinal cord.  With: ...

Plaintiff then cites to two subsections of Section 1.04 which read as follows:

A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

*    *    *    *    *    *    *    *

C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Plaintiff argues that the medical records of Dr. Whitecloud, particularly the reports of April 15, 1998 and October 10, 2001, indicate that plaintiff has:  1) marked degenerative disc disease at L3-4, 2) a previous L5-S1 fusion, 3) retrolisthesis at L2-3 with degenerative disc changes, and 4) spondylolisthesis at L5-S1. (Rec. doc. 21, p. 17).  Plaintiff contends that the records are replete with references to severe lumbar impairments, including limited range of motion, positive straight leg raising tests, and chronic, non-radicular pain, thus satisfying the criteria in Section 1.04.  (Rec. doc. 21, p. 18).

43

A plaintiff in a Social Security case bears the burden of proving that his condition satisfies the criteria of one of those set forth in the Listing of Impairments by pointing to the specific evidence supporting that criteria. Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990); Masterson v. Barnhart, 309 F.2d 267, 272 (5th Cir. 2002); Selders, 914 F.2d at 619. Initially, the Court notes that plaintiff fails to identify which subsection of Section 1.04, whether it be "A" as opposed to "C", his condition satisfies although he does argue the presence of limitation of motion and positive straight leg raising, some of the former criteria, and chronic nonradicular pain, one of the latter criteria. After summarizing the evidence before him, the ALJ found that plaintiff had not carried his burden of proving that his condition satisfied any of the disorders of the musculoskeletal system defined in Section 1.00, there being no specific evidence of muscle weakness or a decrease in sensation (Tr. p. 18). Plaintiff does not identify any evidence of nerve root compression as required by Section 1.04(A) nor does he point to any diagnosis of spinal stenosis with pseudoclaudication as required by Section 1.04(C). Having reviewed plaintiff's medical records, the ME similarly concluded that Listing-level severity had not been established. Substantial evidence supports that conclusion.

Plaintiff's third challenge to the Commissioner's decision is

that the second ALJ who considered his case, unlike the first ALJ, failed to find plaintiff disabled under Rule 201.09 of the Medical Vocational Guidelines as of September 29, 1998, the day before his fiftieth birthday.

At the fifth step of the sequential analysis set forth in 20 C.F.R. §404.1520, the ALJ must determine if there is other work available that a claimant can perform.  "When the claimant suffers only from exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ <u>may</u> rely exclusively on the Guidelines in determining whether there is other work available that the claimant can perform." <u>Selders</u>, 914 F.2d at 618 (citing 20 C.F.R. §404.1569 and Subpt. P, App. 2; <u>Fraga</u>, 810 F.2d at 1304)(emphasis added).  "Otherwise, the ALJ <u>must</u> rely upon  vocational testimony or other similar evidence to establish that such jobs exist."  <u>Fraga</u>, 810 F.2d at 1304 (citing <u>Lawler</u>, 761 F.2d at 198) (emphasis added).  "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." <u>Fields v. Bowen</u>, 805 F.2d 1168, 1170 (5th Cir. 1985).  "A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job." <u>Id</u>.

Although the Regulations do allow the ALJ to take administrative notice of available job data in publications such as the Dictionary of Occupational Titles ("DOT"), 20 C.F.R. §404.1566(d), the Fifth Circuit has questioned whether the DOT amounts to "similar evidence" which can be used to satisfy the Commissioner's burden at the fifth step of §404.1520.  <u>Fields</u>, 805 F.2d at 1170-71.  In the majority of cases, the testimony of a VE is simply more specific than job data contained in publications like the DOT or in a chart. <u>Carey v. Apfel</u>, 230 F.3d 131, 145 (5th Cir. 2000).

Unlike the typical Grid case in which the claimant argues that the Medical-Vocational Guidelines were wrongfully applied in a rigid, mechanical fashion to find him not disabled, <u>see</u>, e.g., <u>Wingo v. Bowen</u>, 852 F.2d 827, 831 (5th Cir. 1988), plaintiff herein argues that the Grids <u>should</u> have been used to find him disabled under Rule 201.09.  Case law and the Regulations themselves counsel that expert vocational testimony is the preferred method of proving that there is other work available that a claimant can perform. <u>Fields</u>, 805 F.2d at 1170-71; <u>Lawler</u>, 761 F.2d at 197-98; <u>Dellolio v. Heckler</u>, 705 F.2d 123, 126-28 (5th Cir. 1983).  And where a claimant suffers from a significant non-exertional impairment, such as obesity-related hypertension, resort to the Grids is foreclosed. <u>Newton v. Apfel</u>, 209 F.3d at 448, 458 (5th Cir. 2000); <u>Fraga</u>, 810 F.2d at 1304.  This claim is without merit.

In his fourth challenge to the Commissioner's decision, plaintiff alleges that the ALJ erred by giving controlling weight to the opinions of Dr. Parnell, who was wrongly referred to as a "treating physician", over those of Dr. Russo and Dr. Whitecloud. Plaintiff additionally complains that "great weight" was given to the opinions of Drs. Mathai and Nitsche, consultative examiners who did not specialize in orthopedic surgery. Finally, plaintiff faults the ALJ for relying upon the reports of two non-examining physicians, two of the three Administration medical consultants, and for utilizing the services of and considering the opinions of the ME, Dr. Weilepp.

The Regulations promulgated by the Commissioner, codified at 20 C.F.R. §404.1527, set forth the manner in which opinion evidence is to be evaluated. Among the evidence to be considered by the ALJ are medical opinions which are defined as "... statements from physicians ... or other medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical ... restrictions." 20 C.F.R. §404.1527(a)(2). Sources who can provide such information include licensed physicians. 20 C.F.R. §404.1513(a)(1). Under §404.1527(d), the ALJ is charged with evaluating _every_ medical opinion he receives

47

regardless of its source.  However, as a general rule, more weight is to be given to the opinion of a "source" who has examined a claimant than a "source" who has not.  20 C.F.R. §404.1527(d)(1).

In addition to the distinction between examining and non-examining sources, §404.1527(d)(2) differentiates "treating sources" from non-treating sources.  The former are able to bring a more " ... detailed, longitudinal picture ..." of the claimant's impairments to the table as opposed to non-treating sources "... such as consultative examinations or brief hospitalizations." Specialization and the length and frequency of the treatment relationship and examinations are also among the factors to be considered in evaluating medical opinions.  20 C.F.R. §404.1527(d)(2)(i) and (d)(5).  Under §404.1527(f)(2)(i), an ALJ <u>must</u> consider the findings of state agency medical consultants as opinion evidence.  And in complex cases, an ALJ may also ask for and consider opinions from medical experts on the nature and severity of a claimant's impairment(s)  and  whether  said impairment(s) satisfies the criteria of any condition set forth in the Listing of Impairments.  20 C.F.R. §404.1527(f)(2)(iii).

The foregoing Regulations notwithstanding, the responsibility of weighing and resolving conflicts in the evidence, including the opinions of treating and examining physicians, lies with the ALJ in the first instance.  <u>Carrier</u>, 944 F.2d at 247; <u>Griego</u>, 940 F.2d  at

945.   The ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of any physician when the evidence supports a contrary conclusion. Newton, 209 F.3d at 455 (quoting Paul v. Shalala, 29 F.3d 208, 211 (5th Cir. 1994), overruled in part on other grounds by Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080 (2000)). A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown. Newton, 209 F.3d at 456 (citing Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999) and Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984 (1995)).   Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion.   Newton, 209 F.3d at 456; Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995); Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir. 1987); Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985). A statement from a medical source that a claimant is "disabled" or "unable to work" is not binding as that is the ultimate issue reserved to the Commissioner.   20 C.F.R. §§404.1527(e)(1), 404.1546.

A review of the ALJ's written opinion of January 3, 2003 reveals that he properly considered all of the evidence before him

prior to making the decision that he did.  In that written opinion, the ALJ on several occasions did refer to Dr. Parnell as a "treating orthopedist" or "treating doctor[ ]."  As noted above, following his workplace accident on May 14, 1994, plaintiff presented himself to Dr. Russo for evaluation who recommended certain modes of treatment.  After plaintiff requested that his employer fund such treatment, plaintiff was referred to Dr. Parnell for further evaluation, including an opinion on the propriety of the treatment Dr. Russo had recommended.  Plaintiff was first seen by Dr. Parnell on June 1, 1994 who performed a physical examination and opined that plaintiff had suffered a soft tissue injury and would not be permanently impaired.  Over the span of the next seventeen months, Dr. Parnell evaluated plaintiff on three additional occasions, those being June 28, 1994, September 15, 1994, and February 1, 1996.  However, throughout this time period Dr. Parnell continued to monitor plaintiff's condition by reviewing the results of an MRI performed at EJGH on June 29, 1994, referring plaintiff for a functional capacity evaluation ("FCE"), and scheduling a "rehab conference" to make further recommendations. Following that conference, Dr. Parnell recommended that plaintiff submit to a myelogram and post-myelogram CT scan to rule out any abnormalities that were not evident through the MRI results.  Those tests went forward on September 27, 1994 and were interpreted by

Dr. Parnell as not requiring surgical intervention.  The doctor then called for a bone scan to rule out occult fracture and, following that procedure, an FCE was performed which produced results indicating that plaintiff was capable of performing work activity in the light exertional level.  Based on the results of the FCE, Dr. Parnell did not feel that plaintiff was capable of performing the heavy work he had done in the past and the doctor even remarked that if he had seen plaintiff for a pre-employment physical, he would not have cleared him for anything more strenuous than light level work.  After plaintiff's employer asked him to return to work he spoke with Dr. Parnell by telephone who reiterated that if a light duty job could be found for him, he could perform it.  (Tr. p. 234).

Given the lengthy relationship that plaintiff had with Dr. Parnell, it is understandable that the ALJ would refer to him more as a "treating" source as opposed to a non-treating source like the consultative examiners, Drs. Mathai and Nitsche, or the non-examining medical sources like the Administrative medical consultants who simply reviewed plaintiff's medical records and opined on his ability to engage in work-related activities.  At the administrative hearing held on August 28, 2002, the ALJ utilized the services of a ME, as ALJ's are encouraged to do, as an aid to evaluating the evidence before him.  <u>Pearson v. Barnhart</u>, 2005 WL

1397049 at *5 (E.D. Tex. 2005).  Having reviewed plaintiff's
medical records and heard his hearing testimony, the ME concurred
with Dr. Parnell that plaintiff was capable of performing light
level work prior to the time that he underwent the lumbar fusion on
April 15, 1998, even going so far as to refer to that surgery as
"elective."  The ALJ was also duty-bound to consider the opinions
of Drs. Mathai and Nitsche, §404.1527(d), which were more in line
with those of Dr. Parnell, and he was likewise required to consider
the opinions of the state agency medical consultants.  20 C.F.R.
§§404.1527(f)(2)(i), 404.1512(b)(6).  Considering the evidence and
the various opinions before him, the ALJ did not err in making the
weight and credibility choices that he did.

     Plaintiff's fifth and final challenge to the Commissioner's
decision is that the ALJ wrongfully denied his request for a
continuance of the August 28, 2002 administrative hearing to obtain
the testimony of Dr. Whitecloud and a lay witness.

     A review of the record reveals that as early as January 23,
2002, plaintiff's counsel was made aware that a physician would be
called to testify as a ME at the hearing to be held before the ALJ.
(Tr. p. 428).  On July 11, 2002, the Administration provided formal
notice to plaintiff that the hearing would go forward on August 28,
2002 and at which both a VE and a ME would testify.  (Tr. pp. 66-
75).  The notice further advised plaintiff that he would be allowed

to present and question witnesses at the hearing and that he could request the issuance of subpoenas for that purpose by making a written demand therefor which included a description of the witness' intended testimony. (Tr. pp. 68, 67).

As set forth in an affidavit by plaintiff's counsel which is appended to her cross-motion for summary judgment, she requested a continuance of the administrative hearing, apparently in a telephone call to the ALJ, because the two witnesses noted above would be unavailable. (Rec. doc. 21, aff.). There is no explanation as to what action, if any, was taken in response to the request for a continuance. As a follow-up to that phone call, on August 26, 2002, two days before the hearing, counsel faxed a letter to the ALJ in which she requested a continuance of the matter due to the fact that the lay witness, whose testimony was " ... extremely important and relevant...," would be out of town at the time. (Rec. doc. 21, ex. A-8). The letter further reflected plaintiff's desire to have Dr. Whitecloud testify in his case based on his familiarity with plaintiff's impairments and surgeries. (Id.). However, the missive says nothing about whether either of the two witnesses was previously notified of the hearing date and time and it is silent as to the precise reason for Dr. Whitecloud's unavailability. (Id.). As further reflected in counsel's affidavit, a denial of her request for a continuance was verbally

relayed to her by an Administration Hearing Assistant on August 27, 2002.  (Rec. doc. 21, aff. at p. 3).  The administrative hearing went forward as scheduled on August 28, 2002.  After explaining the reason why he scheduled the VE and ME to testify, the ALJ asked counsel whether she was "... planning on having anyone else testify?" (Tr. p. 574).  The answer was "[no], your Honor, just Mr. Stroup." (Id.).  The ALJ issued his partially favorable written decision on January 3, 2003.  (Tr. pp. 11-27).  Unfortunately, Dr. Whitecloud passed away on February 18, 2003.  (Rec. doc. 21, ex. A-7, p. 5).

Under the Commissioner's regulations, the ALJ will reschedule the time and place of a hearing only for "good cause" as defined in 20 C.F.R. §404.936(b).  Title 20 C.F.R. §404.936(c) enumerates two instances sufficient to establish good cause, neither one of which is applicable here.  Under §404.936(d), the ALJ may find good cause in other circumstances, after considering the "...reason for requesting the change, the facts supporting it, and the impact of the proposed change on the efficient administration of the hearing process."  Examples of such circumstances include that where "[a] witness who will testify to facts material to your case would be unavailable to attend the scheduled hearing and the evidence cannot be otherwise obtained ..." 20 C.F.R. §404.936(d)(4).  See Johnson v. Sullivan, 894 F.2d 683, 686 (5th Cir. 1990).

Assuming _arguendo_ that the ALJ specifically denied the request for a continuance plaintiff made telephonically and/or by fax, plaintiff should have renewed his request during the course of the hearing or at any time prior to the issuance of the ALJ's decision over four months later.  See _Mulveena v. Sullivan_, 796 F.Supp. 325, 331-32 (N.D. Ill. 1992).  Section 404.936(a) permits an ALJ to adjourn, postpone, or reopen a hearing to receive additional evidence at " ... any time before he or she notifies the parties of a hearing decision."  Plaintiff also failed to avail himself of the subpoena power available under 20 C.F.R. §404.950(d) to secure the attendance of the witnesses he wished to testify.  Plaintiff's pre-hearing request for a continuance failed to describe the testimony the witnesses were expected to give and when specifically asked whether any other witnesses would be called to testify, plaintiff answered in the negative.  _Waters v. Chater_, 66 F.3d 323, 1995 WL 535000 at *12 (5th Cir. 1995)(table).  The ALJ had the benefit of Dr. Whitecloud's medical records before rendering the decision he did and plaintiff was not precluded from supplementing the transcript with any additional records or affidavits in the four-month period following the hearing.  See, e.g., _Fink v. Barnhart_, 123 Fed.Appx. 146, 148 (5th Cir. 2005).  Procedural perfection in administrative proceedings is not required, _Mays_, 837 F.2d at 1364, and plaintiff has failed to establish that he was prejudiced by the

denial of his request for a continuance.  <u>Brock v. Chater</u>, 84 F.3d 726, 728 (5th Cir. 1996).

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this <u>  17th  </u> day of <u>  September  </u>, 2007.

_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE